# WL| Wright Law
## ATTORNEY AT LAW

**305 BROADWAY, SUITE 1001,**
**NEW YORK, NY 10007**
**OFFICE (212) 822-1419 • FACSIMILE (212) 822-1463**
www.wrightlaw.nyc

September 29, 2021

**BY ECF**
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

          Re:    *United States* v. *Felipe Gonzalez* 20 Cr. 237 (PKC)

Dear Judge Castel:

      The undersigned[1] and lead counsel Eric Franz respectfully submit this letter in advance of Mr. Felipe Gonzalez's[2] ("Felipe" or "Mr. Gonzalez") sentencing proceeding, which is scheduled for October 13, 2021, following his April 16, 2021 guilty plea, to the sole count on the Indictment: Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Fentanyl in violation of 21 U.S.C. §841(a)(1) and §841(b)(1)(A).

      Since Mr. Gonzalez has satisfied the conditions of 18 U.S.C. §3553(f)(1)-(5), he qualifies for "safety valve" relief, and is eligible to receive a sentence below the ten year mandatory minimum which would otherwise be required for his offense of conviction (U.S.S.G. §841(b)(1)(A)). PSR ¶79. There is no dispute concerning the applicable guidelines range; the presentence report ("PSR") calculates Mr. Gonzalez's U.S.S.G. guidelines range to be 57 to 71 months. *See* U.S.S.G. §5C1.2(a); PSR ¶79. Although the Probation Department recommends a sentence at the bottom of the guideline range - 57 months – for the reasons that follow we respectfully ask that the Court impose a below guidelines sentence. PSR at page 20 (Sentencing Recommendation).

*Preliminary Statement*

      Mr. Gonzalez is a 54-year-old beloved father, son and sibling, who regretfully re-entered the United States illegally, 16 years after his deportation for another narcotics related crime, so that he could assist his ailing mother who was no longer able to visit him in the Dominican Republic due to

---

[1] On July 30, 2020, the Court appointed me Associate Counsel pursuant to the Southern and Eastern District of New York's Criminal Justice Act Mentoring Program to assist in the representation of the defendant. ECF No. 27.
[2] Mr. Gonzalez's true name is Antonio De Jesus Gutierrez. He admitted to providing a false name and date of birth to I.C.E. agents when he was arrested. PSR ¶53

her medical conditions. His March 17, 2020 arrest was at the very beginning of the COVID-19 pandemic and he was first detained at the MCC jail in Manhattan for 15 months under terribly challenging conditions and for the last 4 months at the MDC jail in Brooklyn. Throughout this entire time Felipe has abided by all prison rules and sustained zero disciplinary infractions. PSR ¶17. Mr. Gonzalez accepted responsibility for his conduct and successfully engaged in a safety valve proffer session with the government, truthfully disclosing his involvement in the offense.

### Legal Standard

As this Court is undoubtedly aware, the United States Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), has reshaped the way a sentencing judge can impose a sentence. The sentencing court may consider the guideline range, as well as any basis to depart from that range. However, the court is no longer required to impose a sentence within that range. In fact, the federal sentencing guidelines are but one factor among several in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007). The guidelines are only the "starting point and initial benchmark…" *Id., citing Gall v. United States*, 552 U.S. 38, 50 (2007). "Sentencing courts are not to 'presume that the Guidelines range is reasonable,' and instead they 'must make an individualized assessment based on the facts presented.'" *United States v. Thavaraja*, 740 F.3d 253, 259 (2d Cir. 2014) (internal citations omitted). It is the sentencing judge who has the advantage of familiarity with the details of the case and can best evaluate the import of the § 3553(a) factors. *Id., Kimbrough*, 552 U.S. at 109, *citing Gall*, 552 U.S. at 51.

### Offense Conduct and Acceptance of Responsibility

As described in the Presentence Report ("PSR"), while Felipe was in New York he was contacted by someone in the Dominican Republic offering to supply him with drugs. PSR ¶32. Felipe did not have the wherewithal to make such a transaction, so he connected the seller in the Dominican Republic with a buyer in New York; in essence he was the middle-man. Id. Thereafter, on March 15, 2020, Felipe's co-defendant set up a drug sale to a confidential source("CS"). PSR ¶20. The following day on March 16, 2020, Felipe accompanied his co-defendant to meet the CS inside of a car in the Bronx, NY, whereupon law enforcement recovered 1,000 grams of heroin and 500 grams of fentanyl and arrested him. PSR ¶¶24, 25.

On May 5, 2021, Mr. Gonzalez made the following candid statement to probation, which captures his offense conduct, acceptance of responsibility and his remorse concerning same:

> The defendant reported that he became involved in this case after receiving a call from an individual who lives in the Dominican Republic offering the defendant to become involved in a drug trafficking deal. The defendant stated that he was not a drug dealer, but he connected the individual with somebody the defendant knew could make the drug transaction. The defendant said that he connected the seller with the buyer. The defendant noted that he was present during the drug trafficking transaction to ensure everything went well. The defendant added that he came to the United States because his mother is sick, and he came to take care of her. He stated that he feels bad with himself and society and is remorseful for his actions.

PSR ¶32.

2

Put simply, although Mr. Gonzalez was no longer in the drug business and did not have a supply to sell, rather than simply say "no", he regretfully yielded to the temptation of making easy money, and acted as a middle-man for the subject drug transaction. *See* Ex. A (Letter from Defendant).[3] Felipe concedes that his role as the "middle-man" does not minimize his offense conduct or the risks attendant to any sale of narcotics.

**History and Characteristics**

Felipe was born in the Dominican Republic in 1966 and raised by hardworking parents who labored to instill Christian values and a work ethic in him despite their financial deprivations. PSR ¶¶53, 56. In 1985, Felipe's mother, Teresa Then Disla, moved to the United States with the hope for a better life and Felipe soon followed her. PSR ¶57; Ex. B at 001.[4] Felipe settled down in New York with a woman named Magdalena Gonzalez and together they had a son, Jedrys Gutierrez, who is now 29 years old and lives in Manhattan. PSR ¶59. Ex. B at 002.

Unfortunately, Felipe made some terrible life choices at a younger age and in 1999 he was arrested and convicted for selling drugs to an undercover police officer in Manhattan. PSR ¶47. Felipe spent roughly 5 years in a New York State prison for that crime, was released in 2004 to immigration custody and deported to the Dominican Republic. PSR ¶47, 61.

For the next 15 years Felipe lived alone and despondent in the Dominican Republic isolated from his son, his ailing mother and his family all of whom lived up in New York City. PSR ¶54; Ex. B at 003, 005. On occasion his family would travel to the Dominican Republic to visit him but as his mother's health deteriorated, she could no longer make the journey. Ex. B at 003. His 73-year-old mother is disabled due to chronic arthritis and heart disease. PSR ¶54; Ex. C.[5]

In 2019, Felipe returned to New York, despite knowing that it was not legal for him to do so. Felipe's older sister, Yomaira Gutierrez, explains that after their father passed away "the vast majority of our family resides here in [New York]; he felt lonely and just wanted to be around his family." Ex. B at 005. His sister, Tomasina Salcedo, elaborates further on Felipe's rationale for returning to New York in that he wanted to help their mother in her time of need and feared losing his mom while he was in the Dominican Republic. Ex. B at 003. Indeed, upon his return to the United States, he lived with his mom at her apartment in Manhattan and had been critical to her health management. Ex. B at 005. His mother was especially happy with his return to New York as he escorted her to doctor's appointments, monitored her diet and ensured she led a healthy life. Id.

While both Felipe and his family understand he illegally re-entered the United States, they humbly concede that the year prior to his arrest was "the happiest days of our lives." Ex. B at 003. The family rejoiced in being with Felipe again after an interminable absence. A sentiment best expressed by his niece, Sonyerlys Rivera:

---

[3] Attached as Exhibit A is a letter from the defendant, Felipe Gonzalez.
[4] Attached as Exhibit B are a collection of letters from Felipe's family and friends, which are bate-stamped for ease of reference.
[5] Attached as Exhibit C is a letter from Felipe's mother's primary care doctor detailing her chronic medical ailments.

3

> Last year (2019) after almost 15 years Felipe came back to New York and we were able to celebrate some holidays together with the entire family together. The most amazing celebration was my wedding. It felt tremendously great to have my uncle around me and more so because he walked me down the aisle. My father resides in Ecuador and was not able to be present and Felipe represented my father.

Ex. B at 006. Felipe's son, Jedrys, also celebrated the brief time he was able to spend with his father as they spent their first Thanksgiving together stating "[t]he time I was able to spend with my father and my family has been a gift." Ex. B at 002.

Felipe's sister, Tomasina, describes her big brother as one who protected her and steered her in the right path of attending college and finding professional success; fondly remembering "the days when he took me by the hand and walked me to school." Ex. B at 003. Both Tomasina and Yomaira, express a comparable joy at their brother's return to New York stating that for the first time the whole family celebrated Thanksgiving, Christmas and New Year's together. Ex. B at 003, 005. This family photo from Christmas 2019 reveals this genuinely happy family (Felipe is seated on the far left):



Ultimately, Felipe's brief return to be with his family turned out to be bittersweet, albeit due to his regretful decision to engage in the instant offense conduct. Ironically, the very person Felipe returned to New York to help, his mother, has suffered the most as a result of his criminal conduct and subsequent incarceration. Ex. B at 001. He can no longer attend to her needs as he had in the past and yet she "forgive[s] him for putting me in a position that causes me to suffer." Id. He acknowledges the great pain he has caused his mother and his loving family, fully cognizant of the joy his brief reappearance may have brought to his family has been largely negated by his selfish criminal conduct. Ex. A.

Felipe's mother is sanguine and ever hopeful writing that her son "expressed [to her] that he will not do anything again to jeopardize his freedom or anything that will make him, his family or this country be ashamed of him." Ex. B at 001. Compounding the deep frustration of Felipe's family is their acute awareness that Felipe has previously been incarcerated for narcotics and now 17 years after his release for that prior offense Felipe finds himself back in the same place; jail. Felipe deeply feels the betrayal, disgrace and humiliation his behavior has caused his family as well as the harm that narcotics visit on society.

**Conditions of Confinement Since Arrest**

4

We readily acknowledge that Felipe's prior jail sentence in 1999 and subsequent deportation did not have the desired effect of discouraging his instant criminal behavior. Indeed, 17 years later Felipe finds himself back in jail. However, reflection during his incarceration has brought some measure of insight into his selfish behavior and measured confidence that he is a changed man.

An important difference this time is the horror visited upon the jails by the Covid-19 pandemic and the simple fact that Felipe is now a middle-aged man with a number of serious medical conditions, including: hypertension (high blood pressure), gout (high uric acid) and arthritis. PSR ¶63. In light of the Covid-19 pandemic, Felipe is a particularly vulnerable inmate in that his hypertension and his age are significant co-morbidities with a Covid-19 infection. *See* Centers for Disease Control ("CDC") ("People with Certain Medical Conditions").[6] Indeed, Felipe tested positive for Covid-19 soon after his detention began and mercifully he survived but he suffered very strong symptoms for five to six days. PSR ¶65. He takes the threat posed by Covid-19 seriously and has been vaccinated with the Johnson & Johnson vaccination.

There is no need to reiterate the staggering facts and statistics that have inundated the Courts regarding the spread and lethality of the disease. For the public at large, the threat has proven more than theoretical. That threat, however, is magnified for those in custody. Since March 2020, the MCC and MDC jails have been in various states of lockdown, with limited time to shower, make legal or personal calls, etc. Felipe confirmed wretched and brutal conditions of confinement while at the MCC jail, often going 8 days without a shower and waking up in the middle of the night to find his jail cell invaded by rats and roaches. Particularly harsh was the near total isolation where he was confined to his jail cell for days on end and long periods of time with little to no communications with his family.

Significantly, Felipe has incredible sympathy for the Bureau of Prisons ("BOP") jail staff as they often stumbled blindly along doing a yeoman's job at containing an unimaginable viral pandemic. He reports that conditions have improved since he was moved to the MDC jail in June 2021, and he has witnessed the BOP make significant strides in trying to contain the Covid-19 virus. Indeed, Felipe is grateful to the BOP for vaccinating him, cognizant that such vaccinations are rare in his native Dominican Republic. Nevertheless, he is brought to tears when discussing the 15 months he spent at MCC jail through the worst of the Covid-19 crisis.

Time spent under such intense emotional strain simply cannot be equated with the anticipated punishment represented in the sentencing guidelines. It would be unjust to discount this reality. Reduced to its essence, we respectfully submit that each month served in the MCC jail during this pandemic is "worth more" when considering the requirement of just punishment than a month spent under more "normal" circumstances.

---

[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. ("Having heart conditions such as heart failure, coronary artery disease, cardiomyopathies, and possibly high blood pressure (hypertension) can make you more likely to get severely ill from COVID-19"); ("Older adults are more likely to get severely ill from COVID-19. More than 80% of COVID-19 deaths occur in people over age 65, and more than 95% of COVID-19 deaths occur in people older than 45.")

In *U.S. v. Aracena De Jesus,* Judge Englemayer granted a substantial downward variance to a defendant in recognition of the harsh conditions of confinement at MCC jail:

> Finally, I am mindful ... that you have served your time in prison so far during the worst pandemic in this country during the past 100 years . . . Bottom line your time at MCC was way harder than anyone intended when you were detained following your arrest. Any mature system of justice, any thoughtful judge in imposing the reasonable sentence here would have to recognize the unexpected and regrettable ardors that you have experienced since your arrest [].

*U.S. v. De Jesus*, 20-CR-19 (PAE) (July 1, 2020 Sentencing Transcript) ECF No. 27.

Other Judges within this district have imposed reduced sentences based on the Covid-19 pandemic and the resultant harsh pretrial conditions of confinement. *See e.g. U.S. v. Morgan* 19-CR-209 (RMB) (S.D.N.Y. May 5, 2020) (reduced sentence in part based on the pandemic conditions, 15 month sentence where guideline range was 41 to 51 months); *U.S. v. Pierson*, 14-CR-855 (LTS) (S.N.D.Y. May 4, 2020) (same rationale, time served sentence for violation of supervised release); *U.S. v Casillas* 19-CR-863 (VSB) (SDNY May 4, 2020) (same rationale, time served sentence where guideline range was 15 to 21 months). We respectfully submit that the challenging conditions of confinement at the MCC during the Covid-19 pandemic is a factor Your Honor may consider when determining how much additional punishment is necessary for Mr. Gonzalez.

### Mr. Gonzalez consents to the Entry of a Judicial Order of Removal

Notably, in an effort to return to his native Dominican Republic as soon as possible, Mr. Gonzalez has offered to agree to the entry of a Judicial Order of Removal pursuant to 8 U.S.C. §1228(c)(5).

### Conclusion

With the wisdom of being a middle-aged man and facing the abyss of significant jail time and certain deportation, Felipe understands the profound harm his actions have caused society. He has a deep understanding that facilitating a drug sale is not a "victim-less" crime, but rather it feeds our national tragedy of opiate abuse. His sister Yomaira writes that "[r]ecognizing our wrongs" can be difficult but during his incarceration at the worst of Covid-19 and his extreme isolation, Felipe "has learned a significant lesson that will allow him to do better in the future." Ex. B at 005. His sister Tomasina echoes that, writing that her brother failed to "stop and measure the consequences" of his actions, but now she finds hope in that she bears "witness to his remorse; he regrets to have place[d] us all in this situation." Ex. B at 004.

A final letter of support for Felipe is provided by Julio Medina, who runs a non-profit organization that assists inmates transitioning from incarceration called, Exodus. Ex. B at 008. Mr. Medina writes on behalf of Felipe as a friend contending that he has great faith in Felipe and offers his "full personal support" to Felipe upon his eventual release from jail. Id. Felipe's "goodness" is a consistent theme found in each of the submitted letters, indicative of the complex man that is Felipe and speaks to his essential decency.

We respectfully request Your Honor sentence Felipe to a sentence beneath the advisory guidelines range of 57-71 months; a sentence that accurately reflects his role in this offense, his prompt acceptance of responsibility, his successful completion of the safety valve process, his personal history and his medical concerns made that much more acute by the Covid-19 pandemic. A below guidelines sentence, we respectfully submit, would also account for the harsh conditions of confinement during the course of pre-trial detention.

Most Respectfully,

_____
Christopher Wright